IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
FEDERAL DEPOSIT INSURANCE      )
CORPORATION, etc.,             )
                               )
          Plaintiff,           )
                               )
     v.                        )     No.  11 C 8823
                               )
THE COLEMAN LAW FIRM, et al.,  )
                               )
          Defendants.          )
```

MEMORANDUM OPINION AND ORDER

In its role as receiver for the George Washington Savings Bank (the "Bank"), Federal Deposit Insurance Corporation ("FDIC") has brought suit against the Coleman Law Firm ("Coleman") and Kevin Flynn & Associates ("Flynn"), seeking recovery of funds paid to them by the Bank in alleged violation of 12 U.S.C. §1828(k)(3).[1] Defendants filed a motion to dismiss the action under Fed. R. Civ. P. ("Rule") 12(b)(6), and the litigants have briefed the matter. For the reasons stated here, Count I is dismissed as moot, while the motion is denied as to Counts II and III.

But before this opinion turns to its substantive discussion, something should be said about the very fact that there <u>are</u> three "counts" over which the parties have crossed their litigation swords. In truth FDIC has a single "claim for relief," the

---

[1] That and other provisions of Title 12 are hereafter cited "Section --," omitting the prefatory "12 U.S.C."

operative concept in federal practice (see the lucid discussion in NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 291-92 (7th Cir. 1992))--and yet FDIC's counsel, infected by the same virus that tends to inflict itself on virtually all Illinois lawyers, have carved up that single claim into so-called "counts"[2] to separate out different theories of liability. Such separation is of course the hallmark of a "cause of action," a state law concept that should play no role in federal pleading.

Despite the passage of two decades since the teaching essayed in the NAACP case, this Court finds itself part of a small minority that follows its lead. It may or may not be too late to hope for a restoration to first principles (remember that Cato the Elder was ultimately successful in his ubiquitous efforts that had concluded every speech on the floor of the Roman Senate, whatever the subject matter, with "Delenda est Carthago"--"Carthage must be destroyed." But in this instance the parties' usage has compelled this Court to follow their lead by dividing up the discussion in terms of the Complaint's three "counts."

### Rule 12(b)(6) Standards

Under Rule 12(b)(6) a party may move for dismissal of a complaint on the ground of "failure to state a claim upon which

---

[2] It does not seem to trouble counsel that Rule 10(b) speaks of separate counts only in terms of "each claim founded on a separate transaction or occurrence."

relief can be granted."  By now it is stale news that nearly five years ago Bell Atl. Corp. v. Twombly, 550 U.S. 544, 562-63 (2007) repudiated, as overly broad, the then half-century-old formulation in Conley v. Gibson, 355 U.S. 41, 45-46 (1957) "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Twombly held that to survive a Rule 12(b)(6) motion a complaint must provide "only enough facts to state a claim to relief that is plausible on its face" (550 U.S. at 570).  Or put otherwise, "[f]actual allegations must be enough to raise a right of relief above the speculative level" (id. at 555).  Since then Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam) and Ashcroft v. Iqbal, 556 U.S. 662 (2009) have provided further Supreme Court enlightenment on the issue.

Familiar Rule 12(b)(6) principles--still operative under the new pleading regime--require this Court to accept as true all of FDIC's well-pleaded factual allegations, with all reasonable inferences drawn in its favor (Christensen v. County of Boone, 483 F.3d 454, 457 (7th Cir. 2007) (per curiam)).  What follows in this opinion adheres to those principles, with allegations in the Complaint cited "¶ --" and its exhibits cited "Ex. --."

**Background**

In or around June 2009[3] FDIC noted a significant decline in the Bank's overall financial condition and alerted the Bank to its concerns in a September 9 letter and a September 24 meeting with the Bank's Board of Directors (the "Board") (¶29). During that meeting FDIC advised the Bank that its tentative off-site rating under the Uniform Financial Institutions Rating System had fallen and notified the Board that an early comprehensive examination was being scheduled (¶31). One of the Bank's inside directors, Mark J. Weigel ("Mark"), pointed out at a September meeting of the Bank's senior management that the Bank was burdened by the high cost of funds and that its liquidity remained critical (¶32). Throughout October and November the Bank repeatedly sought legal advice from its regulatory counsel about its precarious financial position (¶33). In late October or early November one of the Bank's outside directors, John Kovatch ("Kovatch"), repeatedly observed that the Bank was going to be closed, and in a November 10 meeting of the Bank's senior management Mark noted the likelihood that FDIC would place the Bank under some kind of disciplinary constraint (¶¶34-35).

On November 19 Mark and another inside director of the bank, George E. Weigel ("George"), executed an Advance Payment Retainer

---

[3] All other dates referred to here are also from 2009 unless otherwise specified.

Agreement with Coleman (the "Coleman Agreement") under which Coleman would represent Mark and George "in any action, suit or proceeding...in which [Mark or George] are made, or are threatened to be made, a party to, or a witness in, such action, suit or proceeding by reason of the fact that he is or was an officer, director or employee of [the Bank]" (Ex. 1). On November 20 the Bank paid Coleman $150,000 pursuant to the Coleman Agreement in prepayment for future legal services to be rendered to Mark or George relating to their positions at the Bank (¶24).

FDIC notified the Bank of the early comprehensive examination's findings in a November 24 letter (¶36). It concluded among other things that (a) the Bank's asset quality was of significant concern, (b) the Bank had an excessive amount of adversely classified loans, including approximately $154 million substandard, $2 million doubtful and $33 million in loss status and (c) the Bank should make an immediate adjustment to its Allowances for Loans and Lease Losses account--which provides an estimate of uncollectible debts used to reduce the book value of a bank's loans and leases--to lower its Tier 1 leverage capital (id.). Such an adjustment would cause the Bank to become critically undercapitalized (id.).

By an agreement dated November 30 (the "Flynn Agreement") the Bank retained Flynn to "advise, counsel and defend" various

5

outside directors, including Kovatch, in any proceeding in which an outside director was made or threatened to be made a party or witness by virtue of his or her role as an officer, director or employee of the Bank (¶25, Ex. 2). On December 2 the Bank paid Flynn $100,000 pursuant to the Flynn Agreement in prepayment for future legal services to be rendered to outside directors relating to their positions at the Bank (¶27).

Both the Coleman and Flynn Agreements (Exs. 1 and 2) contain this provision:

> [U]nder the unique and special circumstances present at this time, the Law Firm,[4] Clients and [the Bank] believe the use of an Advance Payment Retainer is advantageous to the Clients because of the present and likely risk that [the Bank] will be seized or otherwise taken over by [FDIC] before the services provided herein are fully provided. As a consequence, the Clients may be left with inadequate resources to pay the law firm for the legal services it is providing to the Clients pursuant to this Agreement.

As the ensuing substantive discussion reflects, those provisions play a key role in the analysis.

On December 4 the banking division of the Illinois Department of Financial and Professional Regulation (the "Department") issued an Order to Cease and Desist (the "Order," Ex. 3) to the Bank pursuant to Sections 5007, 9015 and 11001 of the Illinois Savings Bank Act (¶37). That Order found that the Bank's capital was "less than the minimum permitted" and that the

---

[4] [Footnote by this Court] That term is defined in the two agreements as referring to Coleman or Flynn, as the case may be.

6

Bank was "operating in an unsafe and unsound condition." Relatedly the Order determined that the Bank was "likely to experience a substantial dissipation of assets or earnings that will weaken the condition of [the Bank] and will prejudice the interests of its depositors contrary to the Savings Bank Act."

On February 19, 2010 the Department closed the Bank, reiterating the deficiencies referred to in the Order (¶38). On April 27, 2010 FDIC asked Coleman and Flynn to return their respective retainers of $150,000 and $100,000 (¶42). Coleman and Flynn sent identical responses refusing to return the retainers and stating that the retainers had been used in anticipation of FDIC's takeover of the Bank (Exs. 6 & 7).

### Count I: Declaratory Judgment

Section 1828(k)(3) forbids prepayment of legal expenses on behalf of institution-affiliated parties, such as a financial institution's officers and directors, if (a) such payments are made either in contemplation of the institution's insolvency or after an act of insolvency and (b) the payments have the purpose or effect of preventing the proper application of the assets of the institution to its creditors or prefer one creditor over another. FDIC alleges that the payments made pursuant to the Coleman and Flynn Agreements fit those criteria (¶¶41, 46, 47). Complaint Count I seeks a declaratory judgment against Coleman and Flynn under 28 U.S.C. §2201 to establish that the Coleman and

7

Flynn Agreements are void ab initio under Section 1828(k)(3) and require repayment of the funds paid under those Agreements.

Coleman and Flynn argue that the purpose of a declaratory judgment is "to avoid accrual of avoidable damages to one not certain of his rights" and that remedy is therefore inappropriate where the alleged damage has already occurred (Cunningham Bros., Inc. v. Bail, 407 F.2d 1165, 1167-68 (7th Cir. 1969) (internal quotations omitted)). For its part, FDIC seeks to call upon Bontkowski v. Smith, 305 F.3d 757, 761 (7th Cir. 2002) as the springboard for a response.

In candor, the need for that debate, and indeed for this Court's involvement, are a total waste of resources. So-called Count I simply exemplifies the point made in the second paragraph of this opinion, for it would just add another theory en route to the recovery sought in the other two "counts." Hence Count I is dismissed as moot.

**Counts II and III: Repayment of the Retainer Fees**

Defendants advance a number of reasons why Counts II and III, which seek repayment of the retainer fees by Coleman and Flynn respectively, should be dismissed. None of those arguments is at all persuasive.

First, D. Mem. 4-5 contends that FDIC cannot recover a payment made in violation of Section 1828(k)(3) because the statute merely prohibits financial institutions from making

8

payments under certain circumstances and does not expressly authorize any right of recovery in the event of a violation. But FDIC is not attempting to advance a federally implied private action--instead it invokes Illinois law as to the consequences of the violation of the federal statute.

Illinois courts have routinely held that a contract in violation of a valid statute is void without exception because the law cannot enforce a contract that it prohibits (Kim v. Citigroup, Inc., 368 Ill. App. 3d 298, 307, 856 N.E.2d 639, 647 (1st Dist. 2006)). Although courts generally leave parties to a void contract where they find them, an exception arises where the parties are not in pari delicto and where the law violated by the contract is intended to protect the person who paid for the services (Gamboa v. Alvarado, 407 Ill. App. 3d 70, 75-76, 341 N.E.2d 1012, 1017 (1st Dist. 2011)).

Here FDIC stepped into the Bank's shoes at the time of its appointment as receiver (FDIC v. Berman, 2 F.3d 1424, 1438 (7th Cir. 1993)) and is clearly not in pari delicto with Coleman and Flynn. Recall the obvious purpose of Section 1828(k)(3): to ensure a properly ratable distribution of an insolvent bank's assets by preventing precisely this situation--that of bank insiders diverting funds to their own legal defense, thereby carving out a piece of the corporate pie before it can be shared

9

(as it should be) among the Bank's creditors.[5]

Defendants argue that the Gamboa exception does not apply because they had less knowledge of the Bank's financial condition than the Bank did at the time they entered into the Coleman and Flynn Agreements (D. R. Mem. 13-14). But the express language of the Agreements makes it clear that both Coleman and Flynn understood that it was FDIC's anticipated imminent takeover of the Bank that necessitated the prepayment of their legal services in the first place, for after the takeover the Bank's officers and directors would no longer be able to divert Bank assets to their legal defense.

That Illinois courts may generally sanction the use of retainer agreements does not change the facts that the specific agreements here are void and that the defendants--sophisticated law firms--know that they were trying to steal a march on the Bank's existing creditors. It really does not matter whether defendants knew about Section 1828(h)(3) or knew that the Agreements violated that statute.

Second, defendants claim that Counts II and III must be dismissed because the Complaint exhibits supposedly establish that FDIC took over the Bank as a result of its

---

[5] Because it is the Bank insiders for whose benefit the Agreements were reached and because those insiders, not the Bank itself, are at equal fault with Coleman and Flynn, the exception to application of the in pari delicto doctrine would still hold if the Bank rather than FDIC were the comparator.

undercapitalization rather than insolvency, so that the retainer payments assertedly did not violate Section 1828(k)(3) (D. Mem. 5-12). That too does not survive analysis.

Although defendants dedicate much of their memoranda to the contention that undercapitalization is not the same as insolvency, that is really irrelevant because current insolvency is not the standard for violation of Section 1828(k)(3). D. Mem. 6 perplexingly describes insolvency as a "requisite element" of FDIC's claims, but Section 1828(k)(3) makes clear that FDIC need show only that the payments were made <u>in contemplation of insolvency</u> or, in other words, at a time when the Bank was not yet actually insolvent. Even if FDIC had predicated its Bank takeover solely as a result of undercapitalization, the payments to Coleman and Flynn would still have been made in contemplation of insolvency, hence in violation of Section 1828(k)(3). Indeed, defendants' own caselaw states that undercapitalization, though not necessarily equivalent to insolvency, "increases the risk of insolvency" (<u>Baldi v. Samuelson & Co., Ltd.</u>, 548 F.3d 579, 584 (7th Cir. 2008)).[6]

In any event, the D. Mem. 6 suggestion that undercapitalization was the sole ground for FDIC's takeover of

---

[6] See also the later discussion of the Fifth Circuit's <u>Goldberg</u> case and the n.8 explanation of the meaning of "in contemplation of insolvency" rather than "insolvency" simpliciter.

11

the Bank and that the Complaint and its exhibits "conclusively demonstrate that [the Bank] was not insolvent" is disingenuous at best. Instead Ex. 5 identified a number of grounds in addition to undercapitalization, including:

> (2) That there is a likelihood that the savings bank will not be able to meet the demands of its depositors or pay its obligations in the normal course of business.
>
> (3) That losses have occurred or are likely to occur that have or will deplete all or substantially all of the savings bank's capital and that there is no reasonable prospect for replenishment of the savings bank's capital without federal assistance.
>
> (4) That the savings bank is in an unsafe or unsound condition likely to cause insolvency or a substantial dissipation of assets or earnings that will weaken the condition of the savings bank and will prejudice the interests of its depositors.
>
> (5) That the deposit accounts of the savings bank are impaired to the extent that the realizable value of its assets is insufficient to pay in full its creditors and holders of its deposit accounts or meet its obligations in the normal course of business; or that its capital stock is impaired.
>
> (6) That the savings bank is unable to continue operation.

FDIC's allegations as to the time when the Bank had knowledge of its critical financial position date back to September 9, months before the November 20 and December 2 retainer payments. Those allegations assert that before the payments occurred (1) FDIC had advised the Bank that its Uniform Financial Institutions Rating System rating had fallen and that an early examination of the Bank's finances was being scheduled,

12

(2) Mark had advised the Bank's senior management that the Bank was burdened by the high cost of funds and its liquidity remained critical, (3) the Bank repeatedly sought legal advice concerning its precarious financial position, (4) Kovatch observed on more than one occasion that the Bank was going to be closed and (5) Mark noted that FDIC would probably place the Bank under disciplinary constraint (¶¶29, 31-35).

Indeed, both the Coleman and Flynn Agreements themselves explicitly recognize that prepayment would be necessary because of the "present and likely risk" that FDIC would seize the Bank, leaving the Bank insiders without access to Bank funds. As an additional (though not vital) fillip, the Bank received the dismal results of FDIC's examination on November 24 (which, although after the Coleman payment, preceded the payment to Flynn)(¶36).[7] Any suggestion that this Court should find as a matter of law that the retainers were not paid in contemplation of insolvency is frankly preposterous--so it is wholly unnecessary to pursue the alternative question whether the payments were made after an act of insolvency.

Third, D. Mem. 12-15 argues that the retainer payments did

---

[7] Bizarrely, D. Mem. 7 characterizes the November 24 results of the FDIC examination as "[t]he earliest allegation concerning [the Bank's] financial condition." Perhaps defense counsel neglected to read (or more likely read but conveniently ignored) Complaint ¶¶ 29 and 31-35, which must be accepted as true for purposes of this motion (Christensen, 483 F.3d at 457).

not prevent the proper application of the Bank's assets or prefer defendants over the Bank's creditors because Illinois state law generally permits the prepayment of legal fees, so that the funds became defendants' property upon receipt. But it has already been said that retainer agreements are not universally beyond reproach simply because they are typically permitted by Illinois law (Kim, 368 Ill. App. 3d at 307, 856 N.E.2d at 647). Failed banks' assets are distributed according to the priority scheme set forth in Section 1821(d)(11)(A), which provides that administrative expenses of the receiver are paid first, followed by deposit liabilities and then general liability claims such as the unsecured indemnity claims that the Bank's officers and directors would have had if they had not taken $250,000 off the top to prepay their legal expenses. By siphoning funds to defendants after FDIC alleges that insolvency concerns had arisen, those Bank insiders improperly jumped the gun on FDIC, the Bank's depositors and its unsecured creditors, reducing the post-seizure assets available for distribution by $250,000 and thus preferring themselves over all those entitled to priority over them or to privity treatment with them.

FDIC v. Goldberg, 906 F. 2d 1087 (5th Cir. 1990) confronted a conceptually identical situation in which FDIC sought to recover on a $100,000 promissory note executed by bank insider Goldberg, who argued he was not liable because the bank had

issued him a credit extinguishing his liability on the note (id. at 1088). FDIC claimed the credit was granted in contemplation of the bank's insolvency and was therefore void pursuant to Section 91, a provision of the National Bank Act that substantively parallels Section 1828(k)(3). Goldberg, id. at 1091 (internal quotation omitted) reconfirmed that "[a] bank is in contemplation of insolvency when the fact becomes reasonably apparent to its officers that the concern will presently be unable to meet its obligations, and will be obliged to suspend its ordinary operations."[8] It went on to hold that the credit was issued after Goldberg and members of the bank's board knew that closure was imminent, with the credit thus being improper because "[i]f Goldberg is allowed to take $100,000 'off the top'...then every other unsecured creditor will receive proportionately less for his or her claim because the asset pool will have been reduced by that amount" (id. at 1093). Whether a

---

[8] This Court has regularly articulated to counsel during earlier proceedings the universally known dual usage employed when lawyers and judges speak of "insolvency"--sometimes in the often sterile (and often misleading in real-world terms) balance sheet sense and sometimes in the sense employed in the just-quoted holding. Where as here the operative concept is "in contemplation of insolvency," the latter usage is obviously the more plausible--it would plainly be rare (and most likely wholly artificial) to pose a situation in which a bank is focusing on its balance sheet to consider whether some action would convert a positive shareholders' equity to a negative one. By sharp contrast, defense counsel point only to the Bank's balance sheet positive numbers in the face of imminent disaster, much the equivalent of the ship's musicians playing "Nearer My God to Thee" as the Titanic sank to the bottom of the ocean.

15

bank intends to prefer a certain creditor is irrelevant--only the preferential effect of the transfer matters (id.).

That Goldberg language could well have been written for this case. Here the Coleman and Flynn Agreements expressly acknowledge "the present and likely risk that [the Bank] will be seized or otherwise taken over by [FDIC]" (Exs. 1 and 2). Despite that knowledge of likely impending closure, the Bank issued $250,000 in prepayment of legal fees for specified Bank insiders, reducing the pool of assets available to all other creditors.

**Conclusion**

FDIC has met its burden of pleading its right to the relief sought in Counts II and III far beyond the speculative level, with Count I consequently rendered (and dismissed as) moot. Coleman and Flynn are ordered to answer the surviving counts on or before May 29, 2012, and a status hearing is set for 9 a.m. May 31, 2012 to discuss further proceedings in the case. In that respect it appears quite likely that no factual disputes stand in the way of a judgment in FDIC's favor as a matter of law, and defense counsel should come prepared to speak to that subject.

_____
Milton I. Shadur
Senior United States District Judge

Date: May 22, 2012