**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as RECEIVER for GEORGE WASHINGTON SAVINGS BANK, | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 11 CV 8823 |
| v. | ) ) | |
| THE COLEMAN LAW FIRM and KEVIN FLYNN & ASSOCIATES, | ) ) ) ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Federal Deposit Insurance Corporation, as Receiver for George Washington Savings Bank ("FDIC-R") has brought a motion for judgment on the pleadings on its Complaint Counts II and III pursuant to Fed. R. Civ. P. ("Rule") 12(c). Counts II and III seek the return of $250,000 that George Washington Savings Bank (the "Bank") paid to The Coleman Law Firm ("Coleman") and Kevin Flynn & Associates ("Flynn") for not-yet-rendered legal services. FDIC-R alleges that the payment was made in violation of the Federal Deposit Insurance Act ("Act"), more specifically 12 U.S.C. §1828(k)(3).[1] For the reasons set forth in this memorandum opinion and order, FDIC-R's motion is denied.

---

[1] That and other provisions of Title 12 will hereafter be cited simply as "Section --," omitting the prefatory "12 U.S.C." Citations to FDIC-R's reply memorandum will take the form "FDIC R. Mem. --," citations to the Complaint will take the form "Compl. ¶--" and citations to the Answer will take the form "Ans. ¶--."

## Standard of Review

For purposes of a Rule 12(c) motion that seeks to dispose of the case on its substantive merits, "the appropriate standard is that applicable to summary judgment, except that the court may consider only the contents of the pleadings"[2] (Alexander v. City of Chi., 994 F.2d 333, 336 (7th Cir. 1993)).  All well-pleaded allegations in the nonmovant's pleadings must be taken as true, and all facts and reasonable inferences from those facts must be construed in the light most favorable to the nonmovant (id.).  Legal characterizations of the facts by the nonmovant, however, are not binding (Nat'l Fid. Life Ins. Co. v. Karaganis, 811 F.2d 357, 358 (7th Cir. 1987)).

In terms of this case, not only Complaint allegations that Coleman and Flynn have admitted but also allegations to which Coleman and Flynn had an opportunity to respond but that they have not contested are taken as true (Flora v. Home Fed. Sav. & Loan Ass'n, 685 F.2d 209, 211 (7th Cir. 1982)).  Conversely, allegations that Coleman and Flynn have denied properly will, for purposes of the present motion, be considered false (Austad v. United States, 386 F.2d 147, 149 (9th Cir. 1967)).

As to allegations to which Coleman and Flynn have filed a Rule 8(b)(5) disclaimer asserting a "lack of knowledge or information sufficient to form a belief," FDIC R. Mem. 5 argues that they are "uncontested factual allegations" under Rule

---

[2] Documents incorporated by reference into the pleadings may also be considered, and the Court may take judicial notice of matters of public record (United States v. Wood, 925 F.2d 1580, 1582 (7th Cir. 1991)).

8(b)(6) and "[a]ccordingly, for purposes of FDIC-R's 12(c) Motion, this Court should consider as true all relevant allegations in response to which Defendants claimed they lack knowledge." That contention flies in the face of Rule 8(b)(5) itself (emphasis added):

> A party that lacks knowledge or information sufficient to form a belief about the truth of an allegation must so state, and the statement has the effect of a denial."

There are to be sure limited exceptions to that principle, such as a case where the matters disclaimed under Rule 8(b)(5) are matters of public knowledge or where the defendants could have informed themselves on the issues in question "with the slightest effort" (Exch. Nat'l Bank of Chi. v. Brown, No. 84 C 10801, 1985 WL 2274, at *2 (N.D. Ill. Aug. 9)). But this is not certain to be such a case. Most of the disclaimed allegations here concern meetings or conversations between Bank directors or between Bank directors and FDIC officials in the months before Coleman and Flynn were retained (see Compl. ¶¶29-36), matters of which Coleman and Flynn by definition can have no first-hand knowledge.

True enough, the required disclaimer hurdle under Rule 8(b)(5) is much higher than the absence of actual knowledge--for example, any lawyer who comes onto the scene after an event occurs and becomes involved in developments that grow out of that event would certainly seem most likely to be provided with enough information to form a belief about the occurrences that antedated his or her involvement. If then the facts when developed in this case were to establish such a scenario, one or both defendants might perhaps become vulnerable under Rule 11(b)

3

or even 28 U.S.C. §1927 for having improperly brought Rule 8(b)(5) into play.

But no such speculative possibility can justify a judicial rewriting of that rule to convert a deemed denial into an admission. Instead the Complaint's allegations that Coleman and Flynn have disclaimed under Rule 8(b)(5) will be considered as false for purposes of the present motion (Cagan v. Intervest Midwest Real Estate Corp., 774 F. Supp. 1089, 1091 nn. 1 and 2, 1093 (N.D. Ill. 1991)).

### Statement of Facts[3]

On November 19, 2009[4] Bank directors George and Mark Weigel ("the Weigels") executed an Advance Payment Retainer Agreement (the "Coleman Retainer Agreement") with Coleman (Compl. ¶22 and Ex. 1). That Agreement stated that Coleman would represent the Weigels and "advise, counsel and defend [the Weigels] in any action, suit or proceeding, . . . in which [the Weigels] are made, or are threatened to be made, a party to, or a witness in, such action, suit or proceeding by reason of the fact that he is or was an officer, director or employee" of the Bank (id.). Next day the Bank paid Coleman $150,000 pursuant to the Coleman Retainer Agreement (Compl. ¶24).

On November 30 the Bank executed a similar Advanced Payment Retainer Agreement with Flynn (the "Flynn Retainer Agreement") (Compl. ¶25 and Ex. 2). That Agreement was similar to the Coleman Retainer Agreement, except that

---

[3] Unless otherwise indicated, all of the facts discussed below are undisputed by the Coleman-Flynn Answer.

[4] All other dates referred to are also in 2009 unless otherwise indicated.

Flynn was to provide legal services to Grant Currie, John Kovatch, Marty Lucas

and other directors and officers of the Bank (the "Outside Directors") (Compl. ¶25

and Ex. 2). On December 2 the Bank paid Flynn $100,000 pursuant to the Flynn

Retainer Agreement (Compl. ¶27).

Crucially, each of the Retainer Agreements (collectively "the Agreements")

contained this language (id. ¶28 and Exs. 1 and 2 (emphasis added)):

> Generally, a "security" retainer agreement best serves the interest of a
> client because the payment remains the property of the client or, as in
> this case, the entity that is advancing payment on behalf of the client.
> However, under the unique and special circumstances present at this
> time, the Law Firm, Clients and George Washington Savings Bank
> believe the use of an Advance Payment Retainer is advantageous to
> the Clients because of the present and likely risk that George
> Washington Savings Bank will be seized or otherwise taken over by
> the Federal Deposit Insurance Corporation (the "FDIC") before the
> services provided for herein are fully provided. Under a "security"
> retainer, any funds that have not been billed against for services
> performed are subject to a demand of immediate freeze and repayment
> to the FDIC as an asset of the estate of George Washington Savings
> Bank. As a consequence, the Clients may be left with inadequate
> resources to pay the Law Firm for the legal services it is providing the
> Clients pursuant to this Agreement.

That and all other relevant language is the same in the two Agreements. Hence

the Agreements will be discussed together throughout this opinion, and all of the

analysis here should be understood to apply to both documents.

While the events just discussed are undisputed, the details of the interactions

between FDIC Corporate ("FDIC-C") and the Bank in the months leading up to the

Bank's failure are not. FDIC-R alleges that after noticing a decline in the Bank's

condition in June 2009 (Compl. ¶29)[5] it began to send a series of letters and have a series of meetings with Bank officials in which it detailed its concerns (id. ¶¶29-36). Coleman and Flynn, however, do not credit many of those allegations (either through a denial or by invoking Rule 8(b)(5)) (see Ans. ¶¶29-36). Although, as stated earlier, allegations that Coleman and Flynn have not admitted will not be credited here, the parties do agree that the following interactions took place:

1. First, the Bank restated its June 2009 Call Report (Compl. ¶31).

2. Next FDIC-C advised the Bank that an early comprehensive examination was scheduled (id.).

3. Regulatory counsel (separate from Coleman and Flynn) represented the Bank in October and November (id. ¶33).

4. On November 24 FDIC-C wrote the Bank a letter concerning its full scale examination, stating (a) that the Bank's asset quality was of significant concern and (b) that the Bank had an excessive amount of adversely classified loans (id. ¶36). FDIC-C recommended that Bank management make an immediate minimum provision to ALLL (allowances for loan and lease losses) of $27 million to lower its Tier 1 Leverage Capital to 0.81% (id.).

It is also undisputed that on December 4 the Illinois Department of Financial and Professional Regulation issued an Order To Cease and Desist (the "Order") pursuant to Sections 5007, 9015 and 11011 of the Illinois Savings Bank Act (id. ¶37

---

[5] That, it should be noted, was more than four months before the first Agreement--the Coleman Retainer Agreement--was executed and implemented.

and Ex. 3).[6]  That Order stated (1) that the Bank's capital was "less than the

minimum permitted" and (2) that the Bank was "operating in an unsafe and

unsound condition" and was "likely to experience a substantial dissipation of assets

or earnings that will weaken the condition of [the Bank] and will prejudice the

interests of its depositors contrary to the Savings Bank Act 205 ILCS/10001(a)(9)"

(Compl. ¶37, Ex. 3).  Finally, it is undisputed that only a few months later, on

February 19, 2010, the Bank failed and FDIC-R was appointed as its receiver

(Compl. ¶38).

## Application of Rule 12(c)

Section 1828(k)(3) states:

No insured depository institution . . . may prepay . . . any liability or
legal expense of any institution-affiliated party if such payment is
made–

(A)     in contemplation of the insolvency of such institution . . . and

(B)     with a view to, or has the result of –

> (I)     preventing the proper application of the assets of the
> institution to creditors; or

> (ii)    preferring one creditor over another.

It is undisputed that the Bank is an "insured depository institution," that Weigels

and the Outside Directors are "institution-affiliated part[ies]" and that the

payments to Coleman and Flynn were in fact made.  Whether the payments were

---

[6] Ex. 3 to the original Complaint was corrected in an amendment (Dkt. No.
20).  References to "Ex. 3" are to the amended version.

made "in contemplation of insolvency" thus becomes the primary issue.

While not given a definition in the statute itself, the phrase "in contemplation of insolvency" was well defined by the Fifth Circuit in <u>FDIC v. Goldberg</u>, 906 F.2d 1087 (5th Cir. 1990).[7] <u>Goldberg</u>, <u>id.</u> at 1091 (internal citations and quotation marks omitted, emphasis in the original) teaches:

> A bank is in contemplation of insolvency when the fact becomes reasonably apparent to its officers that the concern will presently be unable to meet its obligations, and will be obliged to suspend its ordinary obligations. In other words, if the officers of the bank knew, or <u>ought to have known</u> that at the time of the transfers the suspension of the regular business of the bank was imminent, the transfers were made in contemplation of insolvency.

Given the demanding standard of review applicable to Rule 12(c) motions, with all Complaint allegations that are denied or disclaimed treated as false (<u>Austad</u>, 386 F.2d at 149) and with all reasonable inferences drawn in favor of Coleman and Flynn, (<u>Alexander</u>, 994 F.2d at 336), this Court cannot find as a matter of law that the payments were made "in contemplation of insolvency." It must be remembered that the necessary "contemplation" is that of the Bank (that is, its officers and directors), and neither the Bank nor the Directors are parties to this lawsuit. So despite the obvious and strong inferences conveyed by the timing of events and by the language of the Advance Payment Retainer Agreements

---

[7] <u>Goldberg</u> involved Section 91 of the National Bank Act (<u>id.</u>). Both Section 1828(k)(3) of the Federal Deposit Insurance Act and Section 91 of the National Bank Act "contemplate[ ] ratable distribution of the assets of an insolvent bank among its several creditors . . . " (906 F.2d at 1094 (internal quotation marks omitted); see also May 22, 2012 Order, Dkt No. 26 at 9).

themselves, at this threshold pleading stage Coleman and Flynn can effectively play ostrich.[8]

That said, it is only fair to send a shot across Coleman's and Flynn's bows. If when the evidence comes in it becomes clear that they have indeed played ostrich--for example, that the Bank's situation about which its Directors and officers "knew or ought to have known" (see Goldberg) was conveyed to Coleman and Flynn during the negotiation of their Agreements (as would appear to be highly likely)--this Court would not contemplate[9] joining their ostrich flock.[10] Instead it seems entirely possible that the factual development will leave no room for reasonable inferences in favor of Coleman and Flynn. That however remains for the future.

### Conclusion

What has been said is enough to defeat FDIC-R's motion, and it is

---

[8] In that respect it seems quite inconceivable that responsible counsel for the Bank and the Directors, if they were confronted by the Complaint's allegations that have been disclaimed by Coleman and Flynn, would feel free to interpose Rule 8(b)(5) disclaimers where Coleman and Flynn have asserted them.

[9] That locution is not accidental--it reflects the common usage and meaning of the counterpart noun "contemplation." In each instance the meaning, the thought being conveyed, is that of thinking about and anticipating the prospect of insolvency (in Webster's Third New International Dictionary--the big one--the relevant definition of "contemplation" is "the act of intending or considering a future event"). Though the Bank did not of course "intend" its insolvency when it entered into the Agreements with Coleman and Flynn, it cannot be gainsaid that it was considering that prospect when it provided the Directors with the $250,000 now in controversy.

[10] With apologies to ornithologists, who probably know the collective term for ostriches that corresponds, for example, to a gaggle of geese, this opinion has fallen back on the generic term "flock."

unnecessary to address the other arguments raised by the parties. And because

FDIC-R has acted prematurely in seeking an early disposition under Rule 12(c), its

motion is denied and the parties are expected to go forward with discovery in the

regular course. For that purpose such matters as the possible cost to Coleman and

Flynn over and above their potential return of the $250,000 at issue here are to be

considered as part of the total picture. This action is set for a status hearing at

8:45 a.m. November 13, 2012 to discuss the course of future proceedings in the case.

_____
Milton I. Shadur
Senior United States District Judge

Date:  November 7, 2012